DRAGON CAPITAL PARTNERS
L.P., Plaintiff,

v.

MERRILL LYNCH CAPITAL SERVICES
INC., Merrill Lynch International Inc.,
Merrill Lynch, Pierce, Fenner & Smith
Incorporated, and Merrill Lynch & Co.,
Inc., Defendants.

No. 96 Civ. 0918 (DAB).

United States District Court,
S.D. New York.

Jan. 14, 1997.

Watson, Farley & Williams, New York City (Alfred E. Yudes, Jr., Christopher P. Belisle, of counsel), for Plaintiff.

Brown & Wood, New York City (A. Robert Pietrzak, Stephen T. Paine, Helene T. Glotzer, of counsel), for Defendants.

### MEMORANDUM and ORDER

BATTS, District Judge.

Merrill Lynch [1] Capital Services Inc., Merrill Lynch International Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated and Merrill Lynch & Co., Inc. (collectively "the Defendants" or "ML") move to dismiss the Complaint in deference to proceedings pending in Hong Kong and on the basis of Forum Non Conveniens. In the alternative, Defendants move to stay the action based on the same grounds. For the reasons set forth below, this action is dismissed.

### I. BACKGROUND

The Plaintiff, Dragon Capital Partners, L.P. ("Plaintiff" or "Dragon") is a limited partnership investment fund incorporated in

---

1. "Merrill Lynch" will be abbreviated to "ML" throughout this Memorandum and Order.

the Cayman Islands. (Compl. ¶ 1; Ninkov Aff. ¶ 3.) The Defendants are part of a global investment banking firm. (Compl. ¶¶ 4, 12.) All the Defendants are incorporated in and operate under the laws of Delaware and maintain their principal places of business at the World Financial Center in New York. (Compl. ¶¶ 2–3.) Defendant, Merrill Lynch & Co., Inc. (hereinafter "ML & Co."), is the direct or indirect parent company of the other Defendants in this action. (Compl. ¶ 3.)

In July 1993, Vladen Ninkov ("Ninkov"), Dragon's exclusive agent, approached Richard Klein ("Klein"), an acquaintance employed in the ML London office. (Compl. ¶¶ 10, 15; Ninkov Aff. ¶ 1.) After conducting one transaction for Dragon, (Compl. ¶ 15), Klein allegedly explained that any future direct investments by Dragon in Asia–Pacific entities would have to be made through a ML Asian broker. (Compl. ¶ 17.) In January 1994, at Klein's suggestion, Ninkov met with two ML Asian brokers, Anthony Stalker ("Stalker") and Scott Ashton ("Ashton"), both of whom were based in Hong Kong. (Compl. ¶¶ 17–18.) During the meeting, the brokers described what services ML could provide in the event that Dragon chose to invest further in the Asia–Pacific Area. (Compl. ¶ 18.)

## A. The Quanto Options

Dragon's first investment through the ML Asian brokers was the purchase of unlisted Nikkei Index Quanto Call Options ("the Quanto Options"), a set of synthetic instruments developed specifically by ML and traded in over-the-counter markets. (Compl. ¶¶ 25, 27.) Allegedly relying on various ML representations and guarantees regarding the valuation and liquidity of the options, on February 25, 1994, Ninkov instructed Stalker to purchase for Dragon, 1,867.746 Quanto Options with a strike price [2] of US$19,684.00, for a total premium of US$5,000,000.88. (Compl. ¶¶ 26, 28–29, 33.)

Also on February 25, 1994, Ninkov received both oral and written confirmation of the Quanto Options purchase. (Compl. ¶ 34.) Apparently reiterated on March 1, March 2 and March 4 of 1994, all confirmations listed Merrill Lynch Capital Services Inc. ("ML Capital") as counterparty to the Quanto Options; Merrill Lynch, Pierce, Fenner & Smith as agent under the Quanto Options; and ML & Co. as guarantor for the obligations of ML Capital thereunder. (Compl. ¶¶ 36–37.) The confirmations were delivered to Dragon on ML New York letterhead. (Ninkov Aff. Ex. A.) On March 9, 1994, Ninkov signed and returned this requisite paperwork to the ML Tokyo office [3]. (Compl. ¶ 38.) On March 4, 1994, Dragon paid into ML's New York bank account, the US$5,000,000.88 premium for the Quanto Options. (Ninkov Aff. ¶ 7; Compl. ¶ 38.)

Stalker and Ninkov discussed the valuation of the Quanto Options on an almost daily basis between February and early June 1994. (Compl. ¶¶ 39–40.) Thereafter, communication between the parties became less frequent. (Id.) Plaintiff alleges that the Defendants were neither tracking the rising Nikkei Index as ML had promised, nor reporting the valuation of the Quanto Options. (Compl. ¶ 40.) Plaintiff required the Defendants' valuation of the options because the instruments were not listed. (Compl. ¶ 62.) Plaintiff alleges that it ordered the liquidation of the Quanto Options at various points in June of 1994; however, the Options were not sold at that time. (Compl. ¶¶ 54–61.)

Seeking to monitor and confirm the terms of Dragon's investment in the Quanto Options, Michael Fitzgerald ("Fitzgerald"), a director of Dragon, wrote to Jonathan Moseley ("Moseley") at the ML Hong Kong office. (Compl. ¶ 48.) On August 30, 1995, Fitzgerald met with Moseley, Stalker and other ML representatives in Hong Kong to discuss Dragon's dissatisfaction with ML and the

---

**2.** An option is classified as either a "put" or "call" option. A "call" option gives the buyer the right to *purchase* a specified number of securities at a specific price, the "strike price." A "put" option gives the buyer the right to *sell* a specified number of securities at a specific price, the strike price.

**3.** Ninkov states he sent the documentation to Sal Sprofera at ML's New York office. (Ninkov Aff. ¶ 6; Ex. A.)

Quanto Options. (Compl. ¶¶ 49–50.) Similarly, on December 4, 1995, Graeme Prior, a Dragon accountant, telephoned Stephen Sze, a ML representative stationed in Singapore, requesting an explanation of the Quanto Options valuation methods. (Compl. ¶ 51.)

## B. The HSBC Options

In March of 1994, Ashton suggested to Ninkov that Dragon purchase a quantity of unlisted, over-the-counter, synthetic Hong Kong Shanghai Bank Options ("the HSBC Options") created specially by ML. (Compl. ¶ 67.) Although Ninkov denies having agreed to the purchase, on July 19, 1994, he was contacted by Anne Romito ("Romito") of ML Equity Derivatives in Tokyo, who claimed that Dragon was delinquent in its payment of the HSBC Options premium of approximately US$500,000.00. (Compl. ¶¶ 69, 76; Ninkov Aff. ¶¶ 8–9.)

In an effort to dispute ML's right to the premium, Ninkov wrote to Romito in Tokyo and then spoke by phone with her and her supervisor, Richard Dunne ("Dunne"), who was also based in Tokyo. (Compl. ¶¶ 81–82). As ML attempted to collect the payment, Ninkov was contacted and allegedly threatened by Dunne, as well as Stalker and Ashton. (Compl. ¶¶ 83–86.) In August of 1994, David Underhill ("Underhill") of ML International Inc. ("ML Int'l"), Hong Kong, became involved in the alleged HSBC Options contract by writing to Ninkov and Fitzgerald and threatening to liquidate Dragon's position in the HSBC Options. (Compl. ¶ 87.) Dragon continued to deny responsibility for the transaction and consequently, the HSBC Options position was liquidated by Andreas Klainguti of ML Int'l, Hong Kong. (Compl. ¶¶ 88–89.)

On October 4, 1994, Dragon received yet another letter from Underhill[4] requesting payment for debts owed to ML as a result of the HSBC Options transactions. (Compl. ¶ 92.) If such payment was not received within 24 hours, ML threatened to liquidate Dragon's position in the Quanto Options. (*Id.*) On October 5, 1994, ML Capital liquidated a portion of Dragon's holdings in ML Quanto Options ("the Initial Liquidation"). (Compl. ¶ 94.)

Over a year later, on January 31, 1996, Ninkov ordered Stalker to liquidate the rest of the Quanto Options owned by Dragon ("the Final Liquidation"). (Compl. ¶¶ 98–100.) Although ML was allegedly reluctant to do so, Ninkov repeated his request by fax to Stalker and the sale was promptly consummated by ML. (Compl. ¶¶ 100–01.) On the evening of January 31, 1996, Ninkov was informed that Dragon's remaining Quanto Options had been liquidated at a price of US$1,238.43 per option for a total amount of US$1,993,656.86. (Compl. ¶ 102.) Dragon has not yet received this sum, despite having given ML remittance instructions. (Compl. ¶¶ 102–05.)

## C. The Hong Kong Action

On October 7, 1994, two days after ML's Initial Liquidation of Dragon's position in Quanto Options, Dragon brought an action seeking injunctive relief in the Hong Kong courts in an effort to reverse the effects of the allegedly wrongful liquidation. (Lane Aff. ¶ 4; Firth Aff. ¶ 7.)[5] However, on October 10, 1994, Dragon voluntarily withdrew this action. (Lane Aff. ¶ 5; Firth Aff. ¶ 7.)

On October 11, 1994, Dragon instead brought an action for damages in the Hong Kong Court against ML Capital, seeking to recover for breach of the agreement relating to the Initial Liquidation of the Quanto Options. (Lane Aff. ¶ 6; Ex. A; Firth Aff. ¶ 8.) At the time, ML related to Dragon that they would reserve their right to contest jurisdiction in Hong Kong. (Lane Aff. ¶ 7.) In addition, ML Capital's counsel in Hong Kong, Linklaters & Paines, was instructed not to accept service of process in Hong

---

4. Underhill claimed that Dragon was indebted to ML for approximately US$436,400.00.

5. Jeffrey Haydn Lane is a solicitor of the Supreme Court of Hong Kong and represents the Plaintiff in the Hong Kong action. (Lane Aff. ¶ 1.)

Michael James Firth is a solicitor of the Supreme Court of Hong Kong and represents the Defendants in the Hong Kong Action. (Firth Aff. ¶ 1.)

Kong. (Lane Aff. at 7; Ex. B.) As a result, Dragon served ML Capital in New York. (*Id.* ¶ 8; Firth Aff. ¶ 8.) In February 1995, ML Capital filed a "Defence and Counterclaim" denying Dragon's claims and alleging, *inter alia*, that ML Capital had been justified in "setting off" Dragon's HSBC Options debt by partial liquidation of its Quanto Options investment and that the Quanto Options Purchase was subject to an ISDA Master Agreement.[6] (Lane Aff. ¶ 9; Ex. C; Firth Aff. ¶ 9.) In March 1995, pleadings in the Hong Kong action were closed; in other words, any amendment to the pleadings or additional parties may now only be done on consent of the parties or with leave of the court. (Lane Aff. ¶ 10; Firth Aff. ¶¶ 26–28.)

During the summer of 1995, the parties engaged in discovery, with both sides filing a "Summons for a Further and Better List of Documents and for Discovery of Particular Documents." (Firth Aff. ¶ 13.) These applications were scheduled to be heard on October 27, 1995. (Firth Aff. ¶ 13; Lane Aff. ¶ 16.) While the parties differ as to the extent of completed discovery in the Hong Kong action, (Firth Aff. ¶ 13; Lane Aff. ¶¶ 14–17), approximately one year elapsed between the time that ML Capital was served in New York and the time the Hong Kong action was stayed.

In late September 1995, a Security Costs order ("Costs Order") was issued by Master O'Donnell,[7] ordering Dragon to pay HK$300,000.00 within 21 days or else face a stay of the action. (Firth Aff. ¶ 14; Lane Aff. ¶ 11.) Several days after the Costs Order was entered, Dragon declined to pay the sum and instead filed a Notice of Appeal. (Lane Aff. ¶ 12.) However, as the 21 day period for payment elapsed pursuant to the Cost Order, the Hong Kong action was stayed before either the appeal or the discovery applications could be heard. (Firth Aff. ¶ 15.)

On February 7, 1996, Dragon sought the consent of ML Capital to pay into Court, the amount required by the Costs Order, despite its expiration several months earlier. (Firth Aff. ¶ 17; Lane Aff. ¶ 12.) ML Capital agreed to the late payment and the stay of proceedings was subsequently lifted on February 23, 1996. (Firth Aff. ¶ 17; Lane Aff. ¶ 13.) On the same day, Dragon informed ML Capital that it intended to apply to the Hong Kong Court for leave to withdraw the Hong Kong action. (Firth Aff. ¶ 18.)

### D. The New York Action

In the instant action, Dragon alleges 24 claims for relief. As set forth in the Complaint, those claims relating to the Quanto Options include: negligence, breach of contract, conversion, breach of fiduciary duties, fraudulent concealment, fraudulent misrepresentation, declaratory judgment for unauthorized transactions, violation of the Commodities Exchange Act § 4(a), violation of the Commodity Exchange Act § 4b, violation of the Commodities Exchange Act, § 4o, violation of § 10(b) of the Exchange Act of 1934 and Rule 10b–5, violation of section 32.9 of the rules of the Commodities Futures Trading Commission, 17 C.F.R. Part 32.9.

Those claims concerning the HSBC options include: breach of fiduciary duty, fraudulent concealment, declaratory judgment for illegal transactions, violation of the Commodity Exchange Act § 4(a), violation of the Commodity Exchange Act § 4b, violation of the Commodities Exchange Act § 4o, violation of § 10(b) of the Exchange Act of 1934 and Rule 10b–5, and violation of section 32.9 of the rules of the Commodities Futures Trading Commission, 17 C.F.R. Part 32.9.

Lastly, Dragon alleges that both ML & Co. and ML, Pierce, Fenner & Smith have violated Section 20 of the Exchange Act of 1934 (controlling person liability). Dragon seeks US$6,300,841.13 plus interest and punitive damages totaling not less than US$20,000,000.00.

---

6. The ISDA (or International Swap Dealers Association) Agreement is a standard form contract. (Ninkov Aff. Ex. G.) Plaintiff claims it was neither signed nor received by them. (Ninkov Aff. ¶ 17.)

7. ML Capital filed the Costs Order on the basis that Dragon is a foreign Plaintiff. Costs Orders are intended to cover potential costs awards at the conclusion of litigation.

## II.  DISCUSSION

### A.  Deference to Foreign Proceedings [8]

■ Courts have the inherent power to stay or dismiss an action based on the pendency of a related proceeding in a foreign jurisdiction. *Houbigant, Inc. v. ACB Mercantile, Inc.,* 914 F.Supp. 997, 1003 (S.D.N.Y. 1996); *Advantage Int'l,* 1994 WL 482114, *2. However, the Court recognizes that its discretion is not boundless, and is limited by its obligation to exercise jurisdiction. *Caspian Invs., Ltd. v. Vicom Holdings, Ltd.,* 770 F.Supp. 880, 884 (S.D.N.Y.1991); *Advantage Int'l,* 1994 WL 482114, at *2. While the United States Supreme Court has not yet articulated the standard for determining whether to stay or dismiss an action in deference to a foreign proceeding, courts tend to weigh a number of factors in their determination, including: 1) the similarity of parties and issues involved, 2) the temporal sequence of filing for each action, 3) considerations of fairness and possibility of prejudice to any of the parties, 4) the adequacy of relief in the alternative forum, and 5) the promotion of judicial efficiency. *Caspian,* 770 F.Supp. at 884 (citations omitted).

### 1.  *The Similarity of Parties and Issues Involved*

Neither the parties nor the issues in this action are identical to those addressed in the Hong Kong Action. While the Hong Kong Complaint was filed solely against ML Capital, the New York Complaint before this Court has named three additional ML entities as Defendants. While the Hong Kong Action focuses on the first liquidation of the Quanto Options, the New York Complaint addresses the fact that ML Capital has not yet remitted to Dragon the proceeds of the final liquidation; in addition, the New York Complaint delves into both transactions in more detail.

However, neither the addition of defendants nor the expansion of claims is dispositive to the disposition of this motion. Courts have repeatedly ruled that "parties and issues need not be identical in order for one action to be stayed or dismissed in deference to an earlier action." *Caspian,* 770 F.Supp. at 884 (paraphrasing *Landis v. North Am. Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 165–66, 81 L.Ed. 153 (1936)); *Continental Time Corp. v. Swiss Credit Bank,* 543 F.Supp. 408, 410 (S.D.N.Y.1982) (New York action dismissed even though it included parties and claims different from those in the foreign suit).

Furthermore, those issues in the instant action that were not previously raised, could in fact now be addressed in the Hong Kong action, by applying for leave to amend the pleadings. (Firth Aff. ¶ 28.) Under Hong Kong's legal system, even after the close of pleadings, parties may amend their pleadings with leave of the court or consent of the parties, regardless of whether new causes of action are added to the action. (*Id.*) The Hong Kong Rules of the Supreme Court, provide that, subject to the discretion of the court to prevent joinder, if it would embarrass or delay a trial or otherwise be inconvenient, persons may be joined together in one action as defendants with the leave of the court or where:

i) if separate actions were brought against each of them some common questions of law or fact would arise in all the actions; and

ii) all rights to relief claimed in the action are in respect of or arise out of the same transaction or series of transactions.

(Firth Aff. ¶ 29.) If the additional defendants were not joined in the existing Hong

---

**8.** The Defendants refer to this argument as International Comity. This is technically incorrect. As defined by *Black's Law Dictionary* 267 (6th ed. 1990), international comity is: "[t]he recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience and to the rights of its own citizens or of other persons who are under the protection of its laws." Furthermore, a recent court decision in this circuit stated:

"courts use the terms comity and, to a lesser extent, international abstention, to refer to the doctrine of judicial deference to pending foreign proceedings, although neither of these terms is technically appropriate. Comity refers to deference to another sovereign's definitive law or judicial decision." *Advantage Int'l Management, Inc., v. Martinez,* No. 93 Civ. 6227, 1994 WL 482114, *4 n. 2 (S.D.N.Y. Sept. 7, 1994) (citations omitted).

Kong action, the Plaintiff could bring additional actions against them in Hong Kong, after which, subject to the provisions of the Hong Kong Rules of the Supreme Court, the Hong Kong Court could consolidate all actions. (*Id.*) However, these issues are not problematic as ML Capital has agreed to both amendment of the Hong Kong pleadings and addition of the three additional ML entities not already named in Hong Kong. (Firth Aff. II ¶ 24). And, all Defendants have agreed to submit to Hong Kong jurisdiction as well as to accept service of process there. (*Id.*) [9]

### 2. *The Temporal Sequence of Filing*

Courts in the Second Circuit have traditionally accorded weight to the temporal sequence of actions pending in two jurisdictions. When the foreign action is pending rather than decided, priority generally goes to the first suit filed. *Ronar, Inc. v. Wallace*, 649 F.Supp. 310, 318 (S.D.N.Y.1986). In this case, Plaintiff filed its complaint in Hong Kong almost one and a half years before initiating the instant suit. Courts have, in the past, deferred to foreign actions that had been filed closer in time to the pending matter than the time period which elapsed in this case. *Continental Time Corp.*, 543 F.Supp. at 409 (dismissing suit that was filed six months after foreign action was brought). Regardless of the parties' disagreements as to the extent of completed discovery, it is clear that the Hong Kong action "has proceeded beyond an initial stage." *Caspian*,

770 F.Supp. at 885. Complaints as well as Answers have been filed, and a Summons for Costs was not only adjudicated but also preliminarily contested. In addition, deference to the first suit filed has been held to be particularly appropriate where, as here, the Plaintiff commenced the initial suit. (*Id.*)

### 3. *Considerations of Fairness and Prejudice*

In this action, it appears that neither the Plaintiff nor the Defendants would be prejudiced by the resolution of this dispute in Hong Kong. Although none of the parties are citizens of Hong Kong, all have engaged in business in that forum and cannot expect to evade its court's jurisdiction.

Plaintiff chose to file its original complaint in Hong Kong. The law is clear that when a Plaintiff invokes the laws of a particular jurisdiction, it cannot then repudiate the courts of that jurisdiction as unable to afford justice to its claims. *See Caspian*, 770 F.Supp. at 885 n. 5.

The Plaintiff argues that the Defendants are bound by a forum selection clause in the disputed ISDA Master Agreement. While the Plaintiff has denied being bound by such an agreement, (Pl.'s Mem. Law at 3, 5; Firth Aff. Ex. C at 5), it alleges that the Defendants' contrary insistence on the validity of such a document recommends conducting the trial of this case in New York.[10] Even though this Court will not address the merits of any claims surrounding the ISDA Agree-

---

9. Plaintiff emphasizes that in Hong Kong, the amendment of pleadings and addition of parties requires the leave of the Hong Kong Court. They further stress that such actions would require extensive amendments to existing pleadings and could nonetheless be contested by the Defendants, who have refused to be served in Hong Kong in the past. (Lane Aff. ¶¶ 20–21.) However, these concerns are minimized by existing Hong Kong law as articulated in this opinion, as well as by the fact that Defendants have acceded to both amendment of the pleadings and joinder of additional parties. (Firth Aff. II ¶ 24).

10. The ISDA Agreement contains a "Governing Law and Jurisdiction" provision that states:

This agreement will be governed by and construed in accordance with the laws of the State of New York without reference to the choice of law doctrine.

(Ninkov Aff. Ex. G. ¶ 13(a); Schedule, Part 4, ¶ (h).)

(b) Jurisdiction. With respect to any suit, action or proceedings relating to this Agreement ... each party irrevocably:

(i) submits ... to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City ... and

(ii) waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such courts, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

(Ninkov Aff. Ex. G. ¶ 13(b)).

ment, Plaintiff's argument lacks merit. First, Plaintiff can not rely on an agreement that it disputes. (Plaintiff's Mem. Law at 3, 5; Firth Aff. Ex. C at 5.) Second, even if the Defendants were bound by the ISDA Agreement, a forum selection clause would now be moot as the Plaintiff originally chose to bring suit in Hong Kong. *Caspian*, 770 F.Supp. at 885 n. 5. Third, even if the forum selection clause were still valid, it could be superseded by a strong argument in favor of deference to a foreign action. *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1000 (2d Cir.), *cert. denied*, 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993) (citations omitted). Fourth, the ISDA provision on Governing Law and Jurisdiction does not mandate that this action be brought in New York. In part, the provision states that the ISDA Agreement is governed by New York's law and a Hong Kong Court could therefore satisfy the clause by applying New York law. The remainder of the ISDA provision, addresses jurisdiction only and does not mandate that an action be filed in the Southern District. For these reasons, this Court holds that neither the Plaintiff nor the Defendants would be prejudiced by dismissal of this action.

### 4. Adequacy of Relief Available in Alternate Forum

The Plaintiff has expressed concern over the adequacy of relief available in Hong Kong. (Pl.'s Mem. Law at 18.) However, this concern alone does not warrant allowing this case to continue in this jurisdiction. It appears that the Hong Kong Court would in fact serve as an adequate forum for the adjudication of these parties' claims.

First, courts in this Circuit have deferred to foreign jurisdictions, even if claims asserted by a party in the United States were recognized by the foreign jurisdiction as similar rather than identical causes of action. *See DeYoung v. Beddome*, 707 F.Supp. 132, 136 (S.D.N.Y.1989) (securities case holding that Canadian law would afford plaintiff substantive rights similar to those they would have in the United States); *see also Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 514 (S.D.N.Y.1982) (though addressing a forum non conveniens argument, the court deferred to a prior action pending in Switzerland, relying partly on the fact that U.S. Commodity Exchange Act claims were actionable in Switzerland as fraud). In this case, it is significant that Hong Kong is a "sister common law jurisdiction with procedures akin to our own." *DeYoung*, 707 F.Supp. at 136 (citation omitted). It appears that the Plaintiff could raise its common law claims for relief under existing Hong Kong law. (Firth Aff. II ¶¶ 15–19.) It has also been determined that the Plaintiff could initiate causes of action for fraud, deceit or misrepresentation, in lieu of the statutory causes of action it is pursuing in this forum. (Firth Aff. ¶ 31; Firth Aff. II ¶ 20.) While Plaintiff's Hong Kong counsel notes that the Hong Kong Court "would have no authority to provide the full range of remedies available under United States law," (Lane Aff. ¶ 21), the task of this Court is to ensure that Plaintiff will have access to adequate relief, rather than to determine which forum would provide Plaintiff with the greatest relief.

Second, in deferring to foreign jurisdictions, courts in this Circuit have not felt impeded by "the mere fact that a foreign court may have to apply United States law to some of the claims before it." *Advantage Int'l*, 1994 WL 482114, at *4. Here, it is doubtful that the Hong Kong Court would either be unwilling or unable to address the parties' substantive rights, if appropriate, under the twelve causes of action arising under United States law, where alternate relief was not available in Hong Kong. (Firth Aff. I ¶ 31(c); Firth Aff. II ¶ 20.)

Third, Plaintiff's reliance on "the uncertain future of the Hong Kong legal system ... [as counseling] heavily in favor of jurisdiction," is misplaced. *See Nowak v. Tak How Inv. Ltd.*, 899 F.Supp. 25, 34 (D.Mass.1995), *aff'd*, 94 F.3d 708 (1st Cir.1996). While the imminent reversion of Hong Kong to the People's Republic of China does of course sow the uncertainty that would naturally accompany any change in political regimes, this Court cannot ignore the guarantees and decisions as to Hong Kong's future that have thus far been made in both the Sino–British Joint Declaration on the Future of Hong Kong

("JD") and the Basic Law of the Hong Kong Special Administrative Region ("BL") as has been promulgated by the National People's Congress of the People's Republic of China. Under these declarations, the capitalist system and way of life is to be maintained for 50 years, (JD, Art. 3(5), (12); Annex I, Art. I; BL, Art. 5), rights and obligations valid under the laws currently in force in Hong Kong will continue to be valid and recognized, (BL, Art. 160), Hong Kong is to enjoy executive, legislative and independent judicial power, (JD, Art. 3(3); Annex I, Art. I; BL, Art. 2), Hong Kong laws, including the common law, rules of equity, statutory law and customary law, are to be maintained following the handover, (JD, Art. 3(3); Annex I, Art. II; BL, Art. 8), and with the exception that the Court of Final Appeal will replace the United Kingdom Privy Council, the judicial system is to be maintained and recognized as independent. (Firth Aff. II ¶ 22.) If these declarations are honored, and there is no reason to suspect otherwise at this point, then the parties to this action will have their rights and obligations recognized as valid after the Chinese takeover.

### 5. *Judicial Efficiency*

Finally, judicial efficiency weighs in favor of deferring to the foreign action. The Hong Kong courts are already familiar with the facts in this case and the suit has already proceeded sufficiently in the foreign forum.

In reaching this decision the Court of course relies on the Defendants' representations that they will submit to jurisdiction and service of process in Hong Kong, as well as agree to the amendment of pleadings and joinder of parties in that action. (Firth Aff. II ¶ 24.)

### B. Forum Non Conveniens

■ The Forum Non Conveniens doctrine "permits a court 'to resist imposition upon its jurisdiction . . .', if dismissal would 'best serve the convenience of the parties and the ends of justice.'" *Murray v. British Broadcasting Corp.*, 906 F.Supp. 858, 861 (S.D.N.Y. 1995), *aff'd*, 81 F.3d 287 (1996) (citations omitted). To this end, courts have traditionally engaged in a two part analysis, first

determining the adequacy of the alternative forum in question and then weighing the public and private interests involved. Broad discretion is afforded the Court and "each case [is to turn] on its facts." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 249, 102 S.Ct. 252, 263, 70 L.Ed.2d 419 (1981) (citing *Williams v. Green Bay & W.R. Co.*, 326 U.S. 549, 557, 66 S.Ct. 284, 288, 90 L.Ed. 311 (1946)).

When the doctrine of Forum Non Conveniens is viewed alongside the analysis undertaken above, the Forum Non Conveniens inquiry persuades this court that dismissal of this action is warranted.

### 1. *Adequacy of Alternative Forum*

The facts of this case clearly support finding Hong Kong to be an adequate alternative forum for the purposes of the forum non conveniens inquiry. The United States Supreme Court has held that the adequate alternative forum requirement is satisfied when the defendant is "amenable to process" in the "other jurisdiction." *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22 (citation omitted). As previously noted, the Defendants are willing to submit to jurisdiction and be served in Hong Kong. (Firth Aff. II ¶ 24.)

Acknowledging that an alternative forum might nevertheless be inadequate by virtue of its substantive law on given issues, courts have also looked to the adequacy of remedies available to the parties in the foreign jurisdiction. *Piper*, 454 U.S. at 254 n. 22, 102 S.Ct. at 265 n. 22 (citation omitted). As discussed above, the alternative remedies available to the Plaintiff and Defendants in this case are sufficient to satisfy the forum non conveniens requirement of adequacy of remedies. Furthermore, the quality of remedies available to the parties in Hong Kong is minimized in a forum non conveniens inquiry. The Supreme Court has stated: "the possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry." *Piper*, 454 U.S. at 246, 102 S.Ct. at 261 (italics in the original). As such, the fact that the Plaintiff might, for example, have to substitute its fraudulent misrepre-

sentations claims for claims under the tort of deceit, (*see* Firth Aff. II ¶ 18) does not make the remedies available to it in Hong Kong inadequate. Similarly, the uncertainty of Hong Kong's legal system does not now render the courts in that jurisdiction inadequate.

### 2. *The Private Interests Factor*

At this point, the private and public interests involved in this action need not be addressed in great depth. In weighing the private interests at play in a forum non conveniens analysis, courts generally consider several factors including: the relative ease of access to sources of proof; the availability of compulsory process for attendance of unwilling witnesses; the cost of obtaining willing witnesses and all other practical problems that make trial of a case easy, expeditious and inexpensive, as well as the enforceability of a judgment if one is obtained. *Murray,* 906 F.Supp. at 863 (citations omitted). Consideration of the private interests in this case suggests that this dispute not be allowed to proceed in this Court. Hong Kong appears to be the more convenient forum for the litigation of this case.

While the Court is not persuaded to dismiss this action on the basis of Defendants' references to *Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506 (S.D.N.Y.1982) (a case in which both parties were non-resident foreigners), considerations of practical convenience weigh in favor of litigating this case in Hong Kong over New York. As the Defendants persuasively note, not once does the Complaint make reference to the United States or New York. (Defs.' Mem. Law at 8.) While the Defendants are United States entities with their principal place of business in New York, they are a global entity that clearly serviced Dragon's Asia–Pacific needs locally. It is presumed that most of the witnesses and paperwork incident to the upcoming trial are not currently located in the United States, (Ninkov Aff. ¶¶ 1–2; Defs.' Reply Mem. Law at 8), thereby suggesting that this Court is a forum non conveniens. *See Murray,* 906 F.Supp. at 864.

Lastly, this Court is not persuaded to retain this action in order to accord deference to the Plaintiff's choice of forum. While there is a strong presumption in favor of a plaintiff's choice of forum, it has also been held that the "presumption applies with less force when the plaintiff or real parties in interest are foreign." *Piper,* 454 U.S. at 255, 102 S.Ct. at 265–66. The plaintiff's choice of a home forum is usually viewed as a convenient choice. *Id.* In this case, it is difficult to see how the Plaintiff's choice of a forum thousands of miles from either office it maintains (in Australia and Hong Kong) is a choice of convenience. Furthermore, the Plaintiff initially chose the Hong Kong forum.

Defendants now submit to the jurisdiction of the Hong Kong Court. And, provided that the Plaintiff brings an action in New York to enforce a Hong Kong judgment that is "final, conclusive and enforceable where rendered", that judgment will be recognized as "conclusive between the parties to the extent that it grants or denies recovery of a sum of money...." *In re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d 195, 204 (2d Cir.), *cert. denied,* 484 U.S. 871, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987).

### 3. *The Public Interests Factor*

Public interest factors relevant to the Forum Non Conveniens determination include court congestion, the local interest in having localized controversies decided at home, the unfairness of imposing the burden of jury service on citizens in a forum unrelated to the dispute, and the appropriateness of trying a case in a forum which is familiar with the law to be applied. *Murray,* 906 F.Supp. at 865 (citations omitted). As the parties have not addressed all these particular factors in great detail, this Court will generally address the public interests involved in this action.

Considering the applicable public interests here, it is clear that this dispute should be litigated in Hong Kong. Hong Kong was the sight of most of the meetings about the transactions in question and the disputed options were intended to track the Japanese Stock Exchange in one instance and simulate warrants listed on the Hong Kong Stock exchange in the other. Compared to Hong Kong, this Court is at a greater distance

from the site of the action. Furthermore, Hong Kong has an local interest in having this "localized controvers[y] decided at home." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). Lastly, the fact that the Defendant entities are based in this country is not weighty enough to allow this case to proceed in this Court. *See Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127, 129 (2d Cir.1987).

### III. CONCLUSION

The Defendants' motion for dismissal pursuant to the doctrines of deference to foreign proceedings and forum non conveniens is GRANTED upon the condition that Defendants submit to jurisdiction and service of process in Hong Kong, as well as agree to the amendment of pleadings and joinder of parties in that action.

Plaintiff and Defendants have sixty (60) days in which to fulfill the conditions stated above, at which time they shall submit a proposed Order of dismissal for the Court's signature.

SO ORDERED.