**PYRENEE, LTD., a Liberian Corporation d/b/a Pyrenee Real Estate Holding Co., Inc., a California business enterprise, Plaintiff,**

v.

**WOCOM COMMODITIES LTD., a Hong Kong Corporation, and Wocom Limited, a Hong Kong Corporation, Defendants.**

**No. 96 C 4401.**

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 20, 1997.

James Arthur McGurk, Santiago A. Durango, Chicago, IL, for plaintiff.

David T. Pritikin, Thomas K. Cauley, Jr., Jonathan I. Loevy, Sidley & Austin, Chicago, IL, for defendants.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This suit represents the second attempt to litigate against the defendants in United States to recover for an alleged commodity fraud scheme that occurred principally in Hong Kong. In a previous case, plaintiff Pyrenee's President, Michael Mak, was unsuccessful in establishing jurisdiction over the defendant Wocom entities. *See Mak v. Wocom Commodities Ltd.,* 1996 WL 388408 (N.D.Ill.1996), *aff'd,* 112 F.3d 287 (7th Cir. 1997). Unfortunately, this "second bite at the apple" does not fare significantly better.

Pyrenee brings this lawsuit alleging violations of the Commodity Exchange Act ("CEA") in connection with trades that Wocom Commodities or Wocom Limited placed (or, in some cases, feigned placing) on the Chicago Mercantile Exchange ("CME"). Instead of executing the trades as Pyrenee requested, Wocom allegedly "bucketed" some, that is, conducted the trades privately in its Hong Kong office, and "stole the ticks" on others, that is, placed the trades but misrepresented their price and kept the difference. The legality of these rather complicated schemes is not at issue here. As an initial matter, we must confront the jurisdictional issues that Wocom raises in its motion. Reduced to its essentials, the motion contends that this Court lacks subject matter jurisdiction and personal jurisdiction over Pyrenee's claims; should these grounds fail, Wocom urges us to dismiss the suit on forum non conveniens or statute of limitations grounds. Although we find subject matter and personal jurisdiction, we ultimately dismiss this suit for its resolution in Hong Kong, a more convenient forum under the circumstances.[1]

---

1. Because we decline to exercise jurisdiction, we need not reach the question whether Pyrenee's claims are time-barred.

## RELEVANT FACTS [2]

### A. The Parties' National Affiliations

The Wocom entities are Hong Kong corporations that do business in Hong Kong. Hung Aff. ¶ 2, 4; Li Aff. ¶¶ 2–3. From 1985 through 1990, Wocom Commodities ("WC") was a Hong Kong broker/dealer trading in spot bullion, foreign currency, foreign exchange, and United States commodities and futures. Hung Aff. ¶ 2. Since 1990, WC has gradually limited its trading activities, and now deals only in Hong Kong spot bullion trading. *Id.* Wocom Limited ("WL") operated as an investment holding company until 1990, when it began acting as a broker in foreign currency, commodities and futures. Li Aff. ¶ 2. Neither WL nor WC has ever had offices in the United States or solicited customers from the United States. Hung Aff. ¶¶ 4–6; Li Aff. ¶¶ 3–5. Nor have they registered as members of any United States exchange. Hung Aff. ¶ 5; Li Aff. ¶ 4. As nonmembers, WC and WL must rely on a United States-based registered futures commission merchant ("FCM") to place their customers' trades on American exchanges. Pl. Resp. Ex. 6.

Pyrenee was organized under the laws of Liberia and is registered there as an "Off-shore Company." Am. Compl. ¶ 3; Def. Mot. Dismiss/S.J. ("Def.Mot.") Ex. D. Offshore companies are not permitted to trade in Liberia, which serves as a tax haven for businesses that operate elsewhere. Def. Mot. Ex. D. Pyrenee alleges that it does business in the United States as Pyrenee Real Estate Holding Co., a California business enterprise based in San Francisco and Menlo Park, CA. Am. Complt. ¶ 3. Pyrenee claims that it is currently qualified to do business in California and continues to own real estate, conduct real estate ventures, and perform under contracts there. *Id.* But Pyrenee submits evidence of only one real estate transaction on California soil, and the evidence reveals that its status as a California corporation is uncertain.[3] We are left without a clear impression as to the location of Pyrenee's primary business activities, although Pyrenee alleges that it does not do business in Hong Kong.

Pyrenee's President, Michael Mak, is a Hong Kong citizen and resident. Am. Compl. ¶ 9; Def. Mot. Ex. B. From 1980 to 1985, he lived in California, directing the operations of Pyrenee Real Estate Holding Co. Pl. Resp. Ex. 2, ¶ 4.

### B. Trading in Pyrenee's Account

In May 1985, Mak returned to Hong Kong and opened a trading account with Wocom [4]

---

**2.** The facts derive from two sources: Pyrenee's complaint and the parties' evidentiary submissions. We are permitted to consider affidavits and other documentary evidence in deciding whether we have subject matter and personal jurisdiction, *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir.1993); *Lifeway Foods, Inc. v. Fresh Made, Inc.*, 940 F.Supp. 1316, 1318 (N.D.Ill.1996), as well as in making a ruling on forum non conveniens, *Maljack Prods., Inc. v. British Pathe News Ltd.*, 1994 WL 270268, at *3 n. 3 (N.D.Ill. June 15, 1994). Although we are looking to materials outside the pleadings, we emphasize that our consequent ruling is not one for summary judgment. As the Seventh Circuit has recognized, summary judgment reflects a merits assessment, while a jurisdictional dismissal is not a judgment on the merits. *See Capitol Leasing*, 999 F.2d at 191 ("In short, the question of jurisdiction is inappropriate for summary judgment …"). Nor is a forum non conveniens determination a question of law appropriate for summary judgment, "rather [it] represent[s] [an] exercise[ ] of structured discretion by trial judges appraising the practical inconveniences posed to the litigants and to the court should a particular action be litigated in one forum rather than another." *Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 632 (3d Cir.1989) (quoting *Pain v.*

*Technologies Corp.*, 637 F.2d 775, 781 (D.C.Cir. 1980)).

**3.** Pyrenee offers the affidavit of its President, Michael Mak, who testifies that Pyrenee's principal place of business has "always been California," and that Pyrenee continues to own and rent real estate in San Francisco. Pl. Resp. Def. Mot. ("Pl.Resp.") Ex. 2, ¶ 4. In support of Mak's claim that California is the company's principal place of business, however, Pyrenee presents only one Grant Deed, dated September 4, 1980, transferring title in a San Francisco property to Pyrenee Real Estate Holding Co. *Id.* Ex. 3, attachment A. It is undisputed that Pyrenee Real Estate Holding Co. was delinquent in its state franchise tax payments from 1991 to 1996, *id.* Ex. 1, ¶ 7; the corporation has consequently not been in good standing since March 1993. R. Valdiviezo Aff. ¶ 4. Although Mak paid all outstanding fees in March 1996, *see* Pl. Resp. Ex. 1, ¶ 7, four months before Pyrenee filed suit, there is no evidence that Pyrenee Real Estate Holding Co. has been restored to good standing in California.

**4.** From this point on, we treat the Wocom entities as one, using the Wocom name collectively. The defendants refer to themselves separately

in Pyrenee's name. Pl. Resp. Ex. 2, ¶ 5. Mak signed a "General Agreement for Customer Accounts" ("the Agreement"), which provided that Wocom would act as Pyrenee's broker in executing trades for, among other things, foreign currency futures on various exchanges. Agreement p.1. Wocom acknowledged that any commodity trades in the United States would be subject to the Commodity Futures Trading Commission Act of 1974 and "any applicable Federal or State laws or regulations having the force of law." *Id.* ¶ 4(c)–(d). In the event of a legal dispute, the Agreement granted Pyrenee the right to proceed in any court of competent jurisdiction. *Id.* ¶ 16(b).

From May 1985 to June 1996, Mak conducted trading in the Pyrenee account from Hong Kong, spending much of his time in Wocom's offices for this purpose and for the purpose of placing trades in a personal account he maintained with Wocom. Pl. Resp. Ex. 2, ¶ 5; Hung Aff. ¶ 8. In July 1996, Mak went back to the United States for six months. Am. Compl. ¶ 10. Mak remained in California until December 1996, all the while directing trading in Pyrenee's Wocom account. Pl. Resp. Ex. 2, ¶ 6. Mak testifies that he frequently discussed Pyrenee's account with Wocom representatives on the phone during this time, but his affidavit does not specify who initiated the calls. *Id.* Wocom claims it had no idea that Mak had returned to the United States, or for that matter, that Pyrenee maintained offices in California as a real estate holding company. Supp. Hung Aff. ¶¶ 4–5. Wocom's Director and General Manager testifies that all daily confirmations of Pyrenee's trades were sent to Mak's Hong Kong address. Hung Aff. ¶ 9. Mak states that the trade confirmations were forwarded to him in California, and contends that he made it clear to Wocom officials that California was his operational base in the latter half of 1996. Pl. Resp. Ex. 2, ¶ 6; Am. Compl. ¶ 10. According to Mak, Wocom acknowledged his change in residence by complying with requests to "notify" him (but it is unclear by what means) in California when various commodities reached threshold prices. Am. Compl. ¶ 10.

It was during the period of Mak's California residence—July to December 1986—that Wocom allegedly began mishandling the Pyrenee account. Pyrenee claims that Wocom engaged in two distinct types of commodity fraud: "bucketing" and "stealing the ticks." *See* 7 U.S.C. § 6b. Bucketing has been described as

> a method of doing business wherein orders of customers for the purchase or sale of commodities for future delivery, instead of being executed by bona fide purchases and sales with other traders, are simply matched and offset in the soliciting firm's own office and the firm itself takes the opposite side of the customer's orders.

*Purdy v. CFTC*, 968 F.2d 510, 520 (5th Cir. 1992). In accordance with this scheme, Wocom allegedly ignored Mak's requests to place foreign currency trades for Pyrenee on the CME and conducted the trades in its own offices instead, putting itself on the opposite side and reaping the profits. Am. Compl. ¶¶ 14–19. Secondly, Wocom allegedly "stole the ticks" from trades that it actually placed for Pyrenee on the CME. *Id.* ¶¶ 21–24. In other words, Wocom placed Pyrenee's trades as requested, but then "confirmed the orders at a less favorable price than executed at the exchange and kept the difference." *Id.* ¶ 22. Pyrenee allegedly did not discover this fraudulent activity until August 1994. *Id.* ¶¶ 12–13.

### C. The Hong Kong Litigation

Mak returned to Hong Kong at the end of 1986 and, in 1990, filed suit in Hong Kong against Wocom in connection with trading on his personal account. Hung Aff. ¶ 10. The Hong Kong action alleged improprieties in "spot" foreign currency transactions, which, in contrast to currency futures trades, are not conducted on any exchange. Pl. Resp. Ex. 2, ¶ 9. The litigation centered on whether Wocom had followed Mak's instructions in making these trades, and included claims that Wocom had made and retained "secret profits." Hung Aff. Ex. 6 (Hong Kong Supreme Court's Judgment in *Michael Mak v. Wocom Commodities Ltd.*). Following a

because they advanced an alternative argument that the Court dismiss WL in the event it retained jurisdiction over WC. Because we dismiss both

defendants on forum non conveniens grounds, we see no reason to continue addressing the defendants individually.

three-month trial ending in June 1994, the court ruled against Mak 'and in favor of Wocom's counterclaim. *Id.* at 63–64. The ruling was affirmed on appeal and currently awaits the next level of judicial review. Hung Aff. ¶ 10.

Through discovery conducted during the trial, Mak obtained in April 1994 Wocom's office order documents memorializing other transactions in Mak's personal account— trades in commodity futures. Pl. Resp. Ex. 2, ¶ 9. Because Mak could not tell from these documents whether all his futures trades had been placed, he retained a commodity futures expert in August 1994 to review the records. *Id.* ¶ 10–11. The expert, Charles M. Seeger III, compared Wocom's documents with information recorded at United States exchanges revealing the actual dates, times, and prices of the trades, and concluded that Wocom's representations departed significantly. Seeger Aff. ¶ 15.

### D. Actions in the United States

Based on Seeger's analysis, Mak also filed suit in the United States alleging that Wocom had bucketed trades in his personal futures account. That suit, which was filed one year before this litigation, was dismissed on July 9, 1996 for lack of subject matter jurisdiction. *See Mak v. Wocom Commodities Ltd.,* 1996 WL 388408, at *8 (N.D.Ill. July 9, 1996). The Seventh Circuit affirmed the district court's ruling on June 17, 1997. *See Mak v. Wocom Commodities Ltd.,* 112 F.3d 287, 291 (7th Cir.1997). On July 18, 1996, while Mak's appeal was pending, Pyrenee brought this action in connection with its corporate account, alleging in Count I that Wocom bucketed Pyrenee's commodity futures trades and including in Count II a claim that was not formally asserted in Mak's action—tick stealing from Pyrenee's futures trades. Pyrenee claims that Wocom's bucketing and tick stealing both violate section 4b of the CEA (7 U.S.C. § 6b).[5] We now turn to the issue of whether we have jurisdiction over these claims and, if so, whether we should nevertheless dismiss the action on forum non conveniens grounds.

---

5. This section prohibits any member of a contract market or its agent from defrauding any person in connection with the making of a fu-

## ANALYSIS

### I. Subject Matter Jurisdiction

#### A. Legal Standards Governing Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. In ruling on a 12(b)(1) motion, the court must assume the allegations in the complaint are true and draw all reasonable inferences in favor of the plaintiff. *Capitol Leasing Co. v. FDIC,* 999 F.2d 188, 191 (7th Cir.1993). Where, as here, the defendant challenges the existence of subject matter jurisdiction as a factual matter, the court may also look beyond the complaint "and view whatever evidence has been submitted on the issue . . . ." *Id.* The burden of proving jurisdiction rests with the plaintiff. *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979).

The Seventh Circuit is clear on the jurisdictional analysis applicable to factual and legal circumstances that mirror those here: "subject matter jurisdiction over international disputes concerning commodity futures transactions is to be largely evaluated according to the 'conduct' and 'effects' tests set out in our decision in *Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103 (7th Cir. 1984)." *Mak v. Wocom Commodities Ltd.,* 112 F.3d 287, 288–89 (7th Cir.1997). The *Tamari* court held that it had subject matter jurisdiction over a dispute between nonresident aliens under the CEA involving trades within the United States even though the parties' other contacts took place outside the country. 730 F.2d at 1104. First, the court determined that Congress did not explicitly limit the CEA's reach to transactions originating within American borders. *Id.* at 1107. Second, the court looked to the Second Restatement on Foreign Relations Law, which establishes principles for exercising jurisdiction over alien defendants and their activities using the "conduct" and "effects" tests. *Id.* n. 11. The conduct test "focuses on the foreigner's conduct within the United States as it relates to the alleged scheme to defraud,"

---

tures contract on any contract market. *Tamari v. Bache & Co. (Lebanon) S.A.L.,* 730 F.2d 1103, 1106 (7th Cir.1984).

and authorizes jurisdiction when "the conduct occurring in the United States is material to the successful completion of the alleged scheme." *Id.* at 1108 (citations omitted). In contrast, the effects test considers whether foreign activities have "caused foreseeable and substantial harm to interests in the United States." *Id.* (citations omitted). Jurisdiction is proper if either test is satisfied. *See North South Finance Corp. v. Al–Turki*, 100 F.3d 1046, 1051 (2d Cir.1996) (characterizing tests as "alternative"); *Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1045 (2d Cir. 1983) (finding jurisdiction based on conduct and declining to address whether effects test supplied "an independent basis for jurisdiction"); *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409, 417 (8th Cir.1979) ("[J]urisdiction may be established by meeting the requirements of either, not both, the conduct or effects test."); *Straub v. Vaisman & Co.*, 540 F.2d 591, 595 (3d Cir.1976) (applying only conduct test); *see also Tamari v. Bache & Co. (Lebanon) S.A.L.*, 547 F.Supp. 309, 311 (N.D.Ill. 1982) (noting that "the weight of authority" holds that meeting either test is sufficient). We now consider whether Pyrenee's CEA claims meet either test.

**B. Pyrenee's Bucketing Claim Fails Both the Conduct and Effects Tests**

■ To establish jurisdiction under the conduct test, the plaintiff must at the very least point to some United States activity by the defendant. *Mak*, 112 F.3d at 289; *Tamari*, 547 F.Supp. at 313. As the *Mak* court explained, "the transmission of commodity futures orders to the United States from foreign parties is an essential step in the consummation of any scheme to defraud through futures trading on the United States exchanges." *Mak*, 112 F.3d at 289 (citing *Tamari*, 730 F.2d at 1108). Pyrenee's bucketing claim fails the conduct test because it asserts that Wocom never executed on the CME the trades that Pyrenee requested. Rather, the entire bucketing scheme allegedly took place in Wocom's Hong Kong office, where Wocom matched and offset Pyrenee's orders and put itself on the opposite side of the transactions. In this respect, Pyrenee's bucketing claim is no different than the claim Mak advanced, which the Seventh Circuit

soundly rejected as insufficient to meet the conduct test:

> What Mak complains about under the CEA did not happen in the United States and involves people who were not in the United States. Everything regarding these particular trades happened or did not happen in Hong Kong. None of the parties or their agents have ever been located in the United States.
>
> . . . .
>
> Consequently, it is clear that the conduct test cannot be met in the present case, as no transaction took place on a domestic exchange (in fact, none of the events of this case took place in the United States).

*Id.* The court likewise rejected as too "hypothetical" Mak's effects test argument that bucketing, in general, adversely affects United States interests by diverting business from American exchanges, potentially increasing transaction costs and distorting market prices. *Id.* at 290. We cannot distinguish the facts underlying Pyrenee's bucketing claim from Mak's in any material manner. Therefore, we have no basis for departing from the Seventh Circuit's determinations in *Mak*.

■ Not surprisingly, Pyrenee refrains from arguing jurisdiction based on conduct, and does not urge us to find the effects test met through bucketing's adverse effects on the United States market. Instead, Pyrenee claims that Wocom's bucketing passes the effects test because it harmed a domestic investor—namely, Pyrenee, which became "the equivalent of" a domestic investor by virtue of Mak's six-month stint in California directing trading "from Pyrenee's California headquarters." *See Tamari*, 547 F.Supp. at 311 (effects test satisfied when "there is a substantial impact on domestic investors or on the domestic market").

This contention is meritless. Pyrenee cites no authority for the proposition that conducting trades from the United States for six months transforms a foreign citizen or his foreign corporation into a domestic investor. Instead, Pyrenee relies on a section of the diversity jurisdiction statute providing that "a corporation shall be deemed to be a citizen of any State by which it has been incorporat-

ed and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1). Presumably Pyrenee means to tie this to Mak's assertion that California has always been Pyrenee's principal place of business, and from that to argue that Pyrenee is a domestic investor. But this bare assertion in Mak's affidavit is unsupported by the record. *See Slowiak v. Land O'Lakes,* 987 F.2d 1293, 1295 (7th Cir.1993) ("Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment."); *First Commodity Traders v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir. 1985) ("Conclusory statements in affidavits opposing a motion for summary judgment are not sufficient to raise a genuine issue of material fact.").[6] Evidence of a singular real estate transaction conducted six years before the trading at issue in this case is not sufficient to establish California as Pyrenee's principal place of business.

Moreover, Wocom supplies authority that rejects a corporate agent's short-term United States residence as the basis for jurisdiction over his foreign corporation's claims. In *Europe & Overseas Commodity Traders v. Banque Paribas London,* 940 F.Supp. 528 (S.D.N.Y.1996), the court held that a foreign corporate investor whose sole shareholder lived in Florida "for most of the time of the investment at issue" could not establish jurisdiction over the foreign defendant's alleged securities fraud. *Id.* at 535. Among the points the court emphasized were the shareholder's foreign citizenship and the fact that he opened the company's trading account and initially placed orders in London. *Id.* While the court primarily addressed the plaintiff's argument under the conduct test, it pointed out that "[e]ven applying a mixture of the conduct and effects test," the alleged fraud "had no effect at all in the United States or on an American investor." *Id.* Similarly, Mak's foreign citizenship, Pyrenee's registration as a foreign corporation, its paltry evi-

dence of California business activity, and the fact Mak instituted Pyrenee's account in Hong Kong, traded there for over a year and then continued trading in Hong Kong after he returned from California counsel heavily against finding that Mak's six-month United States trading bout rendered Pyrenee a domestic investor for purposes of the effects test. Because Pyrenee's bucketing claims meet neither jurisdictional standard, we must address whether his tick stealing allegations secure our jurisdiction.

## C. Pyrenee's Tick Stealing Claim Establishes Jurisdiction Under the Conduct Test

Pyrenee argues that its tick stealing claim provides a basis for subject matter jurisdiction by way of the conduct test. It emphasizes that in contrast to *Mak,* which involved bucketing only,[7] this case includes allegations that Wocom engaged in United States activity—placing trades on the CME—that was material to its allegedly fraudulent tick stealing scheme. While the caselaw presents no identical factual situation, we agree that the alleged facts here fit within *Tamari*'s definition of material conduct and find jurisdiction under the conduct test.

### 1. The Conduct Test Defined

■ The Seventh Circuit's rendering of the conduct test is best elaborated in the district court's *Tamari* opinion, whose analysis the Seventh Circuit expressly adopted on appeal. *See Tamari,* 730 F.2d at 1108. The district court explained that the conduct test does not focus on the parties' residence and citizenship or on whether the dispute involves domestic or foreign securities; rather, courts consider "the relative importance of activities within the United States to the success of the alleged scheme to defraud." 547 F.Supp. at 313–14. "If the conduct is substantial rather than merely preparatory,

---

6. Although this Court is not deciding a summary judgment motion, the Court is free to decide a motion to dismiss for lack of subject matter jurisdiction based on "the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Robinson v. TCI/US West Communications Inc.,* 117 F.3d 900, 904 (5th Cir. 1997). Summary judgment jurisprudence provides excellent guidance in this endeavor.

7. Wocom claims that Mak also brought a tick stealing claim. The district court's opinion in *Mak,* however, reveals that Mak did not allege tick stealing in the complaint or argue it in his brief, and that the court rejected Mak's belated attempt to make the claim though an expert affidavit. 1996 WL 388408, at *7 n. 4.

incidental or fortuitous, the courts are more likely to find jurisdiction. *Id.* at 314. Likewise, jurisdiction cannot be premised on "[c]onduct that occurs within the United States by chance or merely for convenience." *Id.* at 315. As the appellate court summed up, the United States conduct must be "material to the successful completion of the alleged scheme." 730 F.2d at 1108.

■ The difficulty lies in ascertaining the strength of the relational link needed between domestic conduct and the fraudulent scheme. The Seventh Circuit has not answered this question beyond requiring that the conduct be "material" to the fraud, but nearly all the other circuits hold that the domestic act must "directly cause" the claimed loss in order to be material. *See Itoba Ltd. v. Lep Group PLC,* 54 F.3d 118, 121 (2d Cir.1995); *Zoelsch v. Arthur Andersen & Co.,* 824 F.2d 27, 31 (D.C.Cir.1987); *Grunenthal GmbH v. Hotz,* 712 F.2d 421, 424 (9th Cir.1983); *Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc.,* 592 F.2d 409, 418–20 (8th Cir.1979); *SEC v. Kasser,* 548 F.2d 109, 115 (3d Cir.1977). From there, the circuits depart, dividing on the meaning of "directly caused." The Second and D.C. Circuits generally apply a more restrictive standard: they often require the domestic conduct to establish all the elements of the alleged fraud. *See Zoelsch,* 824 F.2d at 31, 33 (domestic conduct must comprise all elements of SEC Rule 10b–5); *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1018 (2d Cir.1975) (jurisdiction limited to the "perpetration of fraudulent acts themselves"; language interpreted as mandating that domestic conduct establish all elements of claim). The Third, Eighth and Ninth Circuits appear to be more lenient, finding jurisdiction where the domestic conduct is "significant with respect to the alleged violation." *Grunenthal,* 712 F.2d at 421; *Continental Grain,* 592 F.2d at 420; *Kasser,* 548 F.2d at 114 (jurisdiction proper where "at least some activity designed to further the fraudulent scheme occurs within this country"). A closer examination of *Tamari* reveals the Seventh Circuit leans toward the more permissive view.

### 2. The *Tamari* Decision

The *Tamari* plaintiffs were Lebanese citizens and residents who sued a Lebanese corporation that placed commodity futures trades for them on the CME through a United States agent. The plaintiffs alleged that the defendant misrepresented its expertise, gave false advice on market conditions, transmitted false reports and false statements to the Tamaris, and mismanaged their account. All communications regarding the Tamaris' account took place in Lebanon, all of the allegedly fraudulent representations were made in Lebanon, and all of the CME trades were wired from Lebanon. Despite all the Lebanese connections, both the district court and the Seventh Circuit found jurisdiction under the conduct test. The Seventh Circuit adopted the district court's analysis and simply ruled that "[t]he transmission of commodity futures orders to the United States would be an essential step in the consummation of any scheme to defraud through futures trading on United States exchanges." 730 F.2d at 1108.

The district court was more specific. Citing the Eighth Circuit's decision in *Continental Grain,* the court noted that several decisions find that a foreign defendant's phone calls or mail to the United States constitutes "conduct" in the United States. 547 F.Supp. at 315. The defendant's act of wiring orders to the CME therefore supplied the requisite United States conduct, and the court held this conduct was "substantial or significant when viewed in relation to its importance" to the alleged fraud because executing the orders was the "final step[]" in the scheme. *Id.* The court rejected the defendant's argument that the CME trades were not material because they had been ruled lawful in prior arbitration between the parties:

> [T]he "lawfulness" of Bache Delaware's execution of the orders, as found by the arbitrators, does not cure any prior fraud in Bache Lebanon's solicitations from the Tamaris, nor does it prevent the execution of the orders from being a necessary and foreseeable step in a scheme to defraud, and thus substantial conduct within the United States.

*Id.* This determination belies any requirement, such as frequently imposed by the Second and D.C. Circuits, that jurisdiction be limited to cases in which the domestic con-

duct constitutes the entire fraud or satisfies all statutory elements.

### 3. The Alleged Tick Stealing Directly Caused Pyrenee's Losses

Comparing the importance of the conduct abroad to the domestic conduct in this case, and keeping in mind the *Tamari* facts and analysis, we conclude that Wocom's act of placing trades on the CME through its United States agent satisfies the conduct test. First, our conclusion is supported by the Seventh Circuit's broad observation that "[t]he transmission of commodity futures orders to the United States would be an essential step in the consummation of *any scheme to defraud through futures trading* on United States exchanges." 730 F.2d at 1108 (emphasis added). Second, placing the CME trades was in fact a substantial or significant step in Wocom's alleged tick stealing scheme: Wocom had to place the trades in order to reap the profits from the gap between the actual trading price and the price as represented to Pyrenee. In other words, without the trade, there would have been no ticks to steal. *See also Psimenos v. E.F. Hutton & Co.*, 722 F.2d 1041, 1044 (2d Cir.1983) ("The trades Hutton executed on American markets constituted the final act in Hutton's alleged fraud on Psimenos, without which Hutton's employees could not have generated commissions for themselves."). As such, trading on the CME was not merely a preparatory activity or something that occurred after the fraud was completed; it was a "material act[] that directly caused [the plaintiff's] claimed losses." *Id.* at 1044.

Wocom insists that the relative importance of United States activities to the alleged tick stealing scheme is slight, and urges that the lawfulness of its CME trades precludes finding them significant to the fraudulent scheme. It is true that Wocom's alleged price misrepresentations occurred in Hong Kong, that Wocom conducted the trades from Hong Kong, and that most, if not all, of the parties' other contacts took place in Hong Kong. Yet these very same foreign contacts were held insufficient to preclude jurisdiction in *Tamari.* Furthermore, *Tamari* squarely rejected the contention that the domestic conduct be unlawful in order to constitute a significant step in the fraudulent scheme.

547 F.Supp. at 315; *see also Psimenos,* 722 F.2d at 1046 (holding that the lawfulness of the domestic transactions does not prevent them from being material to the fraud's completion). Just as the CME trades in *Tamari* were material to the completion of an allegedly fraudulent scheme that included rendering false advice on market conditions, transmitting false reports and false statements, and mismanaging the Tamaris' account, Wocom's CME trades were material to the completion of its alleged scheme to report false trading prices and steal the difference from Pyrenee's account.

Wocom parades before us a number of cases in support of dismissal, all of which are distinguishable on their facts—because the domestic conduct was merely preparatory or incidental to the fraud—or because they apply a different legal standard than the Seventh Circuit. For example, *North South Finance Corp. v. Al–Turki,* 100 F.3d 1046 (2d Cir.1996), was a RICO case involving fraud in connection with the sale of a foreign bank. Every step necessary to the fraud was executed in France and depended on the French defendants' success in corrupting the bank's French manager. *Id.* at 1053. Under these circumstances, the fact that some information used in the fraud was obtained from the bank's New York office was immaterial to the scheme's success. *Id.* In *Bersch v. Drexel Firestone, Inc.,* 519 F.2d 974 (2d Cir.1975), several foreign entities committed fraud by distributing a foreign company's false and misleading prospectus to foreign investors. In contrast to the plethora of key fraudulent activity abroad, the preliminary meetings and the preparation of draft prospectuses in New York merely constituted "preparatory activity." *Id.* at 985 n. 24, 987. The scheme in *Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Bros. Int'l, Ltd.,* 928 F.Supp. 398 (S.D.N.Y.1996), is wholly inapposite because it involved a British defendant fraudulently securing a French investor's agreement to participate in risky financial transactions through misrepresentations made in France and England. The fraud abroad was therefore complete before the defendant conducted any transactions in the United States. *Id.* at 403. *Mormels v. Girofinance, S.A.,* 544 F.Supp. 815 (S.D.N.Y.

1982), can similarly be distinguished because "every fact essential to plaintiffs' charge of fraudulent conduct was committed or occurred in Costa Rica." *Id.* at 817–18. In contrast to all these cases, Wocom's placing commodity trades in the United States was a step "essential" to "[its] scheme to defraud through futures trading on United States exchanges." *Tamari*, 730 F.2d at 1108. Finally, *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27 (D.C.Cir.1987), is inapplicable because it required that the defendant's domestic conduct satisfy every element of a securities fraud claim, a much tougher conduct test than the Seventh Circuit applied in *Tamari.*

Because we conclude that Pyrenee's tick stealing claim establishes subject matter jurisdiction under the conduct test, we have no occasion to consider whether it satisfies the effects test.[8] Now secure that we have jurisdiction to hear this case, the next step is to determine whether we may assert personal jurisdiction over Wocom.

## II. Personal Jurisdiction

### A. Legal Standards Governing Personal Jurisdiction

As is the case with subject matter jurisdiction, the plaintiff bears the burden of establishing personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir.1997). The court must assume the plaintiff's jurisdictional allegations are true unless controverted by the defendant's affidavits. *Vlasak v. Rapid Collection Sys., Inc.*, 962 F.Supp. 1096, 1098 (N.D.Ill.1997); *Lifeway Foods, Inc. v. Fresh Made, Inc.*, 940 F.Supp. 1316, 1318 (N.D.Ill.1996). Should the affidavits conflict, the court must resolve the discrepancy in favor of the plaintiff. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987); *Vlasak*, 962 F.Supp. at 1098. The plaintiff's burden is to provide evidence that establishes a prima facie case for personal jurisdiction. *Turnock*, 816 F.2d at 333. In federal question cases, the prima facie case requirements are twofold: (1) haling the defendant into court must comport with Fifth Amendment Due Process; and (2) the defendant must be amenable to service of process. *United States v. De Ortiz*, 910 F.2d 376, 381 (7th Cir.1990); *Vlasak*, 962 F.Supp. at 1098; *Lifeway*, 940 F.Supp. at 1318.

These two prongs collapse into one, however, when the federal claim is brought against a foreign defendant who lacks "sufficient contacts to satisfy the due process concerns of the long-arm statute of any particular state." *World Tanker Carriers Corp. v. M/V Ya Mawlaya*, 99 F.3d 717, 720 (5th Cir.1996). In such cases, the service of process provisions in Federal Rule of Civil Procedure 4(k)(2) apply. Rule 4(k)(2) conditions both personal jurisdiction and amenability to process on fulfilling federal constitutional dictates:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Therefore, in Rule 4(k)(2) cases, the court makes only one inquiry: does the foreign defendant have sufficient contacts with the United States as a whole in order to satisfy Fifth Amendment Due Process requirements? *World Tanker Carriers*, 99 F.3d at 720; *Eskofot A/S v. E.I. DuPont De Nemours & Co.*, 872 F.Supp. 81, 87 (S.D.N.Y. 1995).[9] This is the dubbed the "minimum contacts test"—the same constitutional analysis that the Seventh Circuit performs in all federal question cases. *See De Ortiz*, 910

---

**8.** In light of the suit's ultimate dismissal on forum non conveniens grounds, we express no opinion as to whether it is appropriate to exercise supplemental jurisdiction over Pyrene's bucketing claim, which, as we determined, lacks its own basis for federal jurisdiction. *See* 28 U.S.C. § 1367 (federal court may hear such claims if they "form part of the same case or controversy" as claims within the court's jurisdiction); *Ammerman v. Sween*, 54 F.3d 423, 424

(7th Cir.1995) (same case or controversy requirement met if claims share a "loose factual connection").

**9.** The Seventh Circuit has not yet had the opportunity to examine the language in Rule 4(k)(2), which was just enacted in 1993. The Rule's application is relatively straightforward, however, and other circuits, particularly the Second, furnish adequate guidance.

F.2d at 382 (where claim raises a federal question, due process commands sufficient contacts only with the United States as a whole); *United Rope Distribs., Inc. v. Seatriumph Marine Corp.,* 930 F.2d 532, 534 (7th Cir.1991) ("When a national court applies national law, the due process clause requires only that the defendant possess sufficient contacts with the United States."). Since Pyrenee does not contend that Wocom's contacts with this forum satisfy the Illinois long-arm statute, and relies exclusively on Rule 4(k)(2) to establish personal jurisdiction, we limit our analysis to determining whether Wocom maintains sufficient contacts with the United States for personal jurisdiction to lie under Rule 4(k)(2).

## B. The Minimum Contacts Test Is Met

██ The minimum contacts test ensures that exercising federal jurisdiction in a particular case comports with " 'traditional notions of fair play and substantial justice.' " *De Ortiz,* 910 F.2d at 382 (quoting *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). Minimum contacts exist if the defendant "should reasonably anticipate being haled into court" in the relevant forum because the defendant "has purposefully avail[ed] itself of the privilege of conducting activities" there. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–77, 105 S.Ct. 2174, 2183–85, 85 L.Ed.2d 528 (1985). District courts in our Circuit have remarked how easily this due process requirement is satisfied, *see Vlasak,* 962 F.Supp. at 1099 (citing other district court decisions), and, indeed, we find that to be the case here.

██ By engaging in United States commodity trading through a United States agent and by acknowledging that its trading is subject to the laws of the United States, Wocom has purposefully availed itself of the privileges associated with conducting activity in this country. Wocom admits that brokering trades on United States exchanges in accordance with American laws is a regular part of its business. In addition, Wocom's General Agreement for Customer Accounts provides that "[a]ll commodity transactions for execution on Contract Markets in the United States are subject to the provisions of the Commodity Futures Trading Commission Act of 1974 and the rules and regulations promulgated thereunder ...." Agreement ¶ 4(c). Along the same lines, the Agreement anticipates foreign jurisdiction arising from trading disputes. *Id.* ¶ 16(b). These concessions to United States regulation are compounded by the fact that Wocom's United States trades on the CME were significant steps in completing the fraud alleged in this case. Under these circumstances, we find that Pyrenee has met its burden of establishing a prima facie case for personal jurisdiction under Rule 4(k)(2) and its minimum contacts requirement.

Up until this point, we have devoted our resources to determining whether Pyrenee has satisfied the formal requisites for jurisdiction. We find that it has. We nevertheless decline to exercise our powers of jurisdiction because Wocom has met its burden of proving that Hong Kong is the more convenient forum for this dispute.[10]

## III. Forum Non Conveniens

### A. Legal Standards Governing Forum Non Conveniens Determinations

██ "[A] trial court may dismiss a suit over which it would normally have jurisdiction if it best serves the convenience of the parties and the ends of justice." *Kamel v. Hill–Rom Co.,* 108 F.3d 799, 802 (7th Cir. 1997) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507, 67 S.Ct. 839, 842, 91 L.Ed. 1055 (1947)). The parties' convenience and the ends of justice are served when an alternative forum has jurisdiction to hear the

---

**10.** A court may not exercise its discretion to dismiss a lawsuit under the doctrine of forum non conveniens unless it possesses jurisdiction over both the litigation and the parties. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 504, 67 S.Ct. 839, 840–41, 91 L.Ed. 1055 (1947) ("Indeed the doctrine of forum non conveniens can never apply if there is absence of jurisdiction or mistake of venue."); *Europe & Overseas Commodity Traders v. Banque Paribas London,* 940 F.Supp. 528, 533 (S.D.N.Y.1996) ("Before it can consider a forum non conveniens motion, a court must first determine whether it has jurisdiction over the case and the parties."); Allan R. Stein, *Forum Non Conveniens and the Redundancy of Court–Access Doctrine,* 133 U. PA. I. REV. 781, 782 (1985) (same).

case, and when "a trial in the chosen forum would result in vexation and oppression to the defendant which would far outweigh the plaintiff's convenience or when the chosen forum would generate administrative and legal entanglements for the trial court." *Id.* (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981)). The defendant has the burden of demonstrating forum non conveniens, *Robinson v. TCI/US West Communications, Inc.,* 117 F.3d 900, 907 (5th Cir.1997), and its burden is met where (1) the new locale provides an "adequate alternative forum," and (2) the balance of private and public interest factors favors dismissal. *Piper,* 454 U.S. at 254, 102 S.Ct. at 265; *Mora v. McDonald's Corp.,* 1997 WL 102546, at *3 (N.D.Ill. Mar.6, 1997). The forum non conveniens determination is left to the "trial court's sound discretion." *Kamel,* 108 F.3d at 802.

### B. Hong Kong Is an Adequate Alternative Forum

 The first step in the analysis is to ascertain whether an adequate alternative forum exists for the litigation. *Kamel,* 108 F.3d at 802. For a forum to be adequate, it must first be "available"; that is, the parties must be amenable to process in and subject to the forum's jurisdiction. *Id.* at 803. Second, litigating in the forum must not deprive the parties "of all remedies" or imperil their fair treatment. *Id.* Pyrenee does not dispute that Hong Kong courts have jurisdiction over and can serve process on both it and Wocom. Pyrenee does contend, however, that Hong Kong is an inadequate forum for two reasons: (1) evidence "indispensable" to its tick stealing claim remains in the United States and outside the Hong Kong courts' subpoena power; and (2) Hong Kong's recent reversion to Chinese sovereignty leaves the future of Hong Kong's legal system uncertain and presents "a substantial likelihood" that trial in Hong Kong "would not meet minimum standards of fairness and legality." Pl. Resp. at 17–18. Both arguments fail.

### 1. The United States Documents are Neither Indispensable Nor Unattainable

 Nothing in the record indicates that Pyrenee must use third-party subpoenas to obtain evidence of the fraud alleged in this case or that the third-party documents are crucial to Pyrenee's claims. Pyrenee does not identify these "indispensable documents" beyond asserting that they are in the possession of Wocom's United States-based FCM, show "the actual prices and the actual number of contracts placed for execution on the floor of the CME," and provide the only "conclusive" means of establishing that Wocom stole ticks or bucketed trades. Pl. Resp. at 17. First, we note that Pyrenee is not required to establish "conclusive" proof of anything. Second, the evidence memorializing actual dates, times, and prices of Wocom's CME trades is irrelevant to Pyrenee's bucketing claim, which is premised on Wocom's fraudulent *failure* to place trades. But most important, this very information—although in relation to Mak's personal account—was obtained by the expert Mak hired in 1994 to analyze Wocom's trading documents for fraud.

Charles Seeger III testifies in his affidavit that comparing the Wocom documents with "actual dates, times and prices recorded on U.S. exchanges for the futures and options on futures contracts purportedly traded by Wocom on Mak's behalf" revealed "major discrepancies ... between the prices at which Wocom represented Mak's trades were executed and the actual prices at the CME for trades at the times indicated on Wocom's internal trade sheets." Pl. Resp. Ex. 4, ¶¶ 13–14. Mr. Seeger did not use judicial process to obtain this exchange data, and we have no basis for concluding that Pyrenee would have to either. In other words, the Seeger affidavit belies Pyrenee's contention that a third-party subpoena to Wocom's New York FCM is the only way to secure proof of the fraud alleged in this case. *See Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506, 511 (S.D.N.Y.1982) (where alleged fraud involved foreign switching of trades previously placed on U.S. exchanges, the U.S. exchange records showing undisputed trades were not crucial evidence; rather, the "hard evidence of the fraudulent scheme" lay in the foreign defendants' internal documents).

Moreover, Wocom has shown that this evidence—assuming it were indispensable—is

within the reach of Hong Kong courts. Hong Kong is a signatory to the Hague Convention on Taking Evidence Abroad in Civil or Commercial Matters and, as such, may use this mechanism to obtain discovery abroad. Although China is not a signatory, it has pledged that following reversion, Hong Kong will continue to honor international agreements to which China is not a party. *See* THE BASIC LAW OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION OF THE PEOPLE'S REPUBLIC OF CHINA art. 153 (1990) [hereinafter BASIC LAW OF 1990] ("International agreements to which the People's Republic of China is not a party but which are implemented in Hong Kong may continue to be implemented in the Hong Kong Special Administrative Region."). We have no reason to assume that China will renege on its promise. *See Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs. Inc.,* 949 F.Supp. 1123, 1129–30 ("[T]his Court cannot ignore the guarantees and decisions as to Hong Kong's future that have thus far been made in … the Basic Law of the Hong Kong Special Administrative Region ("BL") as has been promulgated by the National People's Republic of China.").

Pyrenee rejoins that Hong Kong's observation of the Hague Convention does not guarantee that Hong Kong's own procedural rules permit pretrial discovery of third party records in the United States. It points to *Lony v. E.I. Du Pont de Nemours & Co.,* 886 F.2d 628, 638 (3d Cir.1989), which held that, despite Germany's formal adherence to the Hague Convention, Germany's own procedural rules severely limited document requests and prevented access to crucial United States evidence. But Wocom has in turn provided authority demonstrating that Hong Kong courts suffer no such constraints, and that they regularly secure third-party discovery from the United States by issuing Letters Rogatory or Letters of Request. *See Application of Esses,* 101 F.3d 873, 874 (2d Cir. 1996) (granting request from party to Hong Kong proceeding for third-party documents in the United States); *see also In re Letters of Request From Supreme Court of Hong Kong,* 821 F.Supp. 204, 205, 209 (S.D.N.Y. 1993) (outlining requisites for Letters of Request seeking United States evidence for use

in Hong Kong criminal case). *See generally* 28 U.S.C. § 1782 (statute authorizing United States District Courts to compel document production from party residing in district for use in foreign proceedings). Accordingly, Pyrenee's fear that litigating in Hong Kong will preclude access to third-party evidence located in the United States is unfounded.

**2. Hong Kong's Reversion to China Does Not Deprive Pyrenee of all Remedies**

■ Equally indefensible is Pyrenee's ominous supposition that Hong Kong's July 1997 reversion to Chinese sovereignty renders Hong Kong an inadequate forum. The Supreme Court has held that a forum where the defendant is amenable to process is adequate unless the remedy it provides "is so clearly inadequate or unsatisfactory that it is no remedy at all," an exception present only "[i]n rare circumstances." *Piper,* 454 U.S. at 254 & n. 22, 102 S.Ct. at 265 & n. 22. Pyrenee therefore faces an uphill battle in light of the fact that several courts have expressly found Hong Kong an adequate forum for fraud and other claims, even in the wake of reversion. *See Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs., Inc.,* 949 F.Supp. 1123 (S.D.N.Y.1997); *Karlitz v. Regent Int'l Hotels, Ltd.,* 1997 WL 88291, at *2 (S.D.N.Y. Feb.28, 1997); *Capri Trading Corp. v. Bank Bumiputra Malaysia Berhad,* 812 F.Supp. 1041, 1044 (N.D.Ca.1993).

This position is best explained in *Dragon Capital Partners.* First, the court observed that Hong Kong "is a sister common law jurisdiction with procedures akin to our own." *Id.* at 1129 (internal quotations omitted). The plaintiff had access to satisfactory remedies in Hong Kong because its commodity fraud claims could be raised there as "causes of action for fraud, deceit or misrepresentation." *Id.* In any event, the court explained, the Supreme Court holds that "'the possibility of a change in substantive law should ordinarily not be given conclusive or even substantial weight in the forum non conveniens inquiry.'" *Id.* at 1131 (quoting *Piper,* 454 U.S. at 246, 102 S.Ct. at 261). Addressing Hong Kong's imminent rever-

sion, the court eloquently and persuasively assuaged the plaintiff's fears:

> [T]his Court cannot ignore the guarantees and decisions as to Hong Kong's future that have thus far been made in both the Sino–British Joint Declaration on the Future of Hong Kong ("JD") and the Basic Law of the Hong Kong Special Administrative Region ("BL") as has been promulgated by the National People's Congress of the People's Republic of China. Under these declarations, the capitalist system and way of life is to be maintained for 50 years, (JL, Art. 3(5), (12); Annex I, Art. I; BL, Art. 5), rights and obligations valid under the laws currently in force in Hong Kong will continue to be valid and recognized, (BL, Art. 160), Hong Kong is to enjoy executive, legislative and independent judicial power, (JL, Art. 3(3); Annex I, Art. I; BL, Art. 2), Hong Kong laws, including the common law, rules of equity, statutory law and customary law, are to be maintained following the hand-over, (JL, Art. 3(3); Annex I, Art. II; BL, Art. 8), and with the exception that the Court of Final Appeal will replace the United Kingdom Privy Council, the judicial system is to be maintained and recognized as independent.... If these declarations are honored, and there is no reason to suspect otherwise at this point, then the parties to this action will have their rights and obligations recognized as valid after the Chinese takeover.

*Id.* at 1129–30. Consequently, the court dismissed the lawsuit to Hong Kong, both on forum non conveniens grounds and in deference to proceedings already initiated there.

In contrast to this thoroughly researched and well-reasoned exegesis on reversion's impact on the Hong Kong's legal system, Pyrenee produces a case refusing dismissal to Hong Kong based solely on what appears to be judicial hysteria. *See Nowak v. Tak How Investments, Ltd.,* 899 F.Supp. 25, 34 (D.Mass.1995) ("Furthermore, the uncertain future of the Hong Kong legal system, given the island's reversion to Chinese sovereignty in less than two years, counsels heavily in favor of [United States] jurisdiction ...."), *aff'd,* 94 F.3d 708 (1st Cir.1996) ("Given the likelihood that the Nowaks would face great obstacles in Hong Kong due to possible polit-

ical instability ... efficiency concerns require a Massachusetts forum."). Neither court cites any authority for these conclusory assertions, and as a result they are entitled to little weight. Moreover, current reports confirm that, three months after reversion, such dire predictions have not come to pass. Liz Sly, *Hong Kong's Honeymoon Continues,* Chi.Trib., Oct. 8, 1997, § 1, at 3 (" 'Many say the first 100 days [of an administration] set the tone for the future. I am pleased to say that ... it appears that Hong Kong is staying the course in terms of remaining a free and open society.' ") (quoting United States Commerce Secretary William Daley).

The shortcomings of Pyrenee's judicial authority are not remedied by its expert, Joseph Dellapenna, Professor of Law at Villanova University, whose affidavit consists of conjecture that China will radically alter Hong Kong's legal system in the near future. Professor Dellapenna first recounts his qualifications as an expert in Chinese law and legal matters, then engages in an extended explanation of Chinese legal history and the various inadequacies that plague the system today, including Chinese judges' politicization and lack of formal training or familiarity with a common law legal system. Pl. Resp. Ex.5, ¶¶ 1–27. Where the affidavit fails is in its rank speculation that China's legal system will become Hong Kong's legal system. Dellapenna claims that "there is good reason to believe that sooner rather than later the patterns already found on the mainland of China will prevail in Hong Kong as well." *Id.* ¶ 28. But the following paragraphs largely point to various Chinese actions that have nothing to do with Hong Kong's legal system. *Id.* ¶¶ 29–37. Dellapenna recites only four changes relevant to the judiciary: (1) making four of the five judges on Hong Kong's Court of Final Appeal Chinese, which will "severely limit the influence of experienced common law judges"; (2) requiring the Chief Justice to be Chinese; (3) moving final review to Beijing; and (4) subjecting judicial appointments to Beijing approval. *Id.* ¶¶ 31, 36. The first, third and fourth concerns, however, are rebutted by Wocom's expert, and second does not make Hong Kong's remedies "clearly inadequate or unsatisfactory." *See*

*Piper,* 454 U.S. at 254 & n. 22, 102 S.Ct. at 265 & n. 22.

Wocom's expert, Professor Peter Wesley–Smith, is a Professor of Law at the University of Hong Kong and Dean of the University's Faculty of Law. Def. Reply Ex. C ¶ 1. He has co-edited two volumes on the post–1997 regime in Hong Kong. *Id.* Professor Wesley–Smith explains that Hong Kong's legal system provides for due process of law and other procedural safeguards and will continue to do so after the reversion. *Id.* ¶ 3. The People's Republic of China and Hong Kong ratified in 1985 the Joint Declaration on the Question of Hong Kong, which states that Hong Kong will retain its basic economic and legal systems for at least fifty years following the July 1997 reversion. *Id.* ¶ 4. The Basic Law of 1990 specifically maintains the " 'principle of trial by jury previously practised in Hong Kong,' " and the " 'rights previously enjoyed by parties to criminal and civil proceedings, including expressly the right to a fair trial without delay and the presumption of innocence.' " *Id.* ¶ 6 (quoting BASIC LAW OF 1990 arts. 86, 87). These guarantees are "strengthened by the provisions for the maintenance of judicial independence, including security of tenure for judges." *Id.* ¶ 7; *see* BASIC LAW OF 1990 art. 92 (judges "shall be chosen on the basis of their judicial and professional qualities and may be recruited from other common law jurisdictions."); *id.* art. 91 ("the previous system of appointment and removal of members of the judiciary other than judges" will remain in place).

Wesley–Smith points out that the changes Dellapenna anticipates in Hong Kong's judiciary are based on his erroneous reliance on an earlier draft of the Basic Law (a charge Pyrenee never disputes) and out-of-context interpretations. First, the Basic Law as amended in 1990 requires only the Court of Final Appeals' Chief Justice, not four/fifths of the court, to have Chinese citizenship. Def. Reply Ex. C ¶ 5. The remaining judges need not be any particular race or nationality. *Id.* Second, the 1990 version confirms that " '[t]he power of final adjudication of the [Hong Kong Special Administrative Region] shall be vested in the [Court of Final Appeal] of the Region.' " *Id.* ¶ 6 (quoting BASIC LAW OF 1990 art. 82). The provision on which

Dellapenna relies for his conclusion that Beijing will become the situs for final review relates only to questions of interpretation on the Basic Law, not adjudication. *Id.* ¶ 6. Pyrenee does not contend that this litigation would require Hong Kong courts to interpret the Basic Law. Finally, Dellapenna's opinion that judicial appointments are subject to Beijing's approval is contradicted by Article 88 of the 1990 Basic Law, which "grants the power of appointment of judges to the Chief Executive 'on the recommendation of an independent commission composed of local judges, persons from the legal profession and eminent persons from other sectors.' " *Id.* ¶ 7.

Based on Professor's Wesley–Smith's expertise in Hong Kong law and legal systems, his reliance on the most recent version of the Basic Law, and his uncontroverted opinions grounded in legal authority rather than speculation, we are persuaded by his affidavit, which establishes the adequacy of Hong Kong as an alternative forum for this litigation. Furthermore, nothing else in the record supports a conclusion that the remedies in Hong Kong are clearly inadequate or unsatisfactory. Because Pyrenee has failed to contradict Wocom's proof of adequacy, we find this requirement met.

### C. The Private and Public Interest Factors Favor Hong Kong

Now that we have found Hong Kong to be an adequate forum for this case, we balance the private and public interest factors to determine whether they favor the United States or Hong Kong. *Gulf Oil Co.,* 330 U.S. at 508, 67 S.Ct. at 843; *Kamel,* 108 F.3d at 803. Normally, the plaintiff's choice of forum receives a great deal of deference. But "because the primary objective of any forum non conveniens inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice of forum deserves less deference." *Kamel,* 108 F.3d at 803; *see Piper,* 454 U.S. at 256, 102 S.Ct. at 266 ("When the plaintiff is foreign, however, this assumption [of convenience] is much less reasonable . . . . [and] deserves less deference."). With this in mind, we explore and weigh the relevant factors.

Private interest factors considered in ruling on a forum non conveniens motion include: (1) ease of access to sources of proof; (2) the availability of compulsory process for hostile witnesses and the cost of obtaining the attendance of willing witnesses; (3) the possibility of viewing the premises, if appropriate; and (4) all other practical problems that make trial of the case easy, expeditious and inexpensive. *Gulf Oil Co.*, 330 U.S. at 508, 67 S.Ct. at 843; *Kamel*, 108 F.3d at 803; *Mora*, 1997 WL 102546, at *3. The pertinent public interest factors are: (1) the court's own docket congestion; (2) the preference for having a forum apply law with which it is familiar; (3) the local interest in resolving the controversy; and (4) the unfairness of burdening citizens in an unrelated forum with jury duty. *Piper*, 454 U.S. at 241 n. 6, 102 S.Ct. at 258 n. 6; *Kamel*, 108 F.3d at 803; *Mora*, 1997 WL 102546, at *4. A district court has "substantial flexibility" in considering the relative importance of these factors. *Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1245 (7th Cir.1990).

### 1. The Private Interests Point to Hong Kong

We begin with the private interests. With respect to the first two factors, access to both proof and witnesses will clearly be eased by trial in Hong Kong. The key document for proving fraud, the Pyrenee account records, are located at Wocom Commodities' offices in Hong Kong. Hung Aff. ¶ 13. And the individuals who can decipher these records, current and former Wocom employees in charge of Pyrenee's account, all reside in Hong Kong.[11] Hung Aff. ¶ 14. It is Wocom's employees who know whether the company bucketed Pyrenee's trades by conducting them in its own offices, and Wocom's own documents that would have memorialized these activities. Likewise, Wocom employees and internal trading documents will tell whether Wocom engaged in a fraudulent scheme to misrepresent to Pyrenee the price of its CME futures trades, and the company's financial records will reveal whether

Wocom "stole the ticks" by keeping the price difference.

We have already rejected Pyrenee's two arguments in favor of convenience—that the critical evidence of fraud lies in the hands of Wocom's United States-based FCM, and that third-party discovery cannot be compelled by Hong Kong courts. Although Pyrenee may need to obtain CME documents recording the time, date and price of trades for comparison with Wocom's own trading records, the affidavit of Pyrenee expert Charles Seeger III demonstrates that this information is within Pyrenee's reach. Moreover, Hong Kong has the ability to secure extraterritorial evidence through Letters of Request and Letters Rogatory. Finally, while it is true that the CME trades were a significant step in the alleged scheme to defraud, no one disputes these trades. Rather, the dispute is over the conduct of Wocom employees after the trades became fact. Again, the evidence of this conduct is contained either in Wocom's Hong Kong files or in the memories of Wocom's Hong Kong employees.

The difficulty and expense associated with compelling these employees to testify in the United States would prove prohibitively difficult. All of Wocom's Hong Kong employees are likely beyond our powers of compulsory process, *see McDonald's Corp. v. Bukele*, 960 F.Supp. 1311, 1318 (N.D.Ill.1997), while a Hong Kong court will have far less difficulty in securing the appearance of its own citizens. Even if these witnesses could be forced to make the journey, a flight from Hong Kong to the United States takes a daunting 18 hours and is extremely expensive. Hung Aff. ¶ 17; *see Bukele*, 960 F.Supp. at 1318–19 (cost of transporting witnesses from El Salvador prohibitive); *Europe & Overseas Commodity Traders*, 940 F.Supp. at 538 (cost of transporting witnesses from England prohibitive). On the plaintiff's side, Michael Mak, the key non-Wocom witness who directed all of Pyrenee's trading, is also a Hong Kong citizen. While he may not object to appearing in the United States, he showed his willingness to submit

---

11. One possible exception is Benjamin Leung, chief account executive for Pyrenee's account during 1986, who no longer works for Wocom. Hung Aff. ¶ 15. However, Hung testifies "on information and belief" that Leung still resides in Hong Kong, and neither party suggests that he lives in the United States. *Id.*

to Hong Kong jurisdiction when he filed suit in 1990 against Wocom. *See Bukele*, 960 F.Supp. at 1319–20 (considering plaintiff's suit in El Salvador involving identical parties and similar claims to be proof of its willingness to submit to El Salvadorian jurisdiction). We emphasize that in this fraud case, live testimony is of the utmost importance; "[w]hen fraud charges are made, it is desirable that the factfinder have the benefit of demeanor testimony of witnesses." *Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 511 (S.D.N.Y.1982); *see Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 940 F.Supp. 528, 538 (S.D.N.Y.1996) (finding that "live testimony of key witnesses is necessary 'where the plaintiffs alleged that the defendants had conspired to defraud them.'") (quoting *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232–33 (2d Cir. 1996)). The first two factors therefore point toward dismissal.

Moving on to the third and fourth factors, the third—possibility of viewing the premises—is not an issue. The fourth factor requires a practical evaluation of where trial would be most efficient and economical. All of the principal witnesses, parties and documents are located in Hong and the bulk of the fraud was committed in Hong Kong. Hong Kong courts can compel the attendance of these witnesses and the production of these documents much more easily than this Court. And adequate procedures exist for securing United States documents, if at all necessary. The private interest balance consequently tips in favor of Hong Kong. *See Transamerica ICS, Inc. v. Tugu Ins. Co.*, 588 F.Supp. 1301, 1304 (S.D.N.Y.1984) ("As a matter of fairness, it would be excessively burdensome to require a Hong Kong defendant to bring its Hong Kong witnesses and exhibits around the world to New York to defend itself in a dispute over what is essentially a Hong Kong transaction.").

### 2. Hong Kong Harbors the Strongest Public Interest

█ The first two public interest factors lie in equipoise. With respect to docket congestion, Mak's 1990 action against Wocom demonstrates that litigating in Hong Kong would not involve delays exceeding those here. Mak's complaint in the Hong Kong action was filed in September 1990 and, following a three-month trial, judgment was handed down on June 21, 1994. The Hong Kong court emphasized that the case would have proceeded much faster absent the myriad amendments to Mak's complaint. Judgment at 2. This case was filed in July 1996; we cannot say that its full resolution would take less than four years. While Mak's action did differ in some respects from this suit, it is the best indication we have of comparative court congestion. Based on the evidence before us, we find that the first factor favors neither forum.

As for the preference for having a forum apply law with which it is familiar, neither party contends that this is an issue. While this Court is familiar with the CEA provisions invoked here, Pyrenee does not argue that litigating this case in Hong Kong would force the court there to apply foreign law. Indeed, Pyrenee may assert the same allegations under Hong Kong common law causes of action for fraud, deceit or misrepresentation. *See Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs., Inc.*, 949 F.Supp. 1123, 1129 (S.D.N.Y.1997). Consequently, the second factor does not point in either direction.

But the third and fourth factors once again favor Hong Kong. Pyrenee asserts that the United States has a greater interest in having this dispute resolved within its borders based solely on the CME trades made in furtherance of Wocom's alleged tick stealing. Harkening back to its argument for subject matter jurisdiction under the "effects test" (which we found unnecessary to address), Pyrenee claims that these trades are presumed to have manipulated United States markets because they used an American exchange as part of a scheme to defraud. It is true that the United States has an interest in ensuring the integrity of its markets and in preventing foreign entities from using American exchanges as a base for conducting fraudulent activities. But even assuming that these trades, which are not alleged to have been illegal themselves, can be presumed to have harmed domestic markets under the "effects test" for subject matter jurisdiction purposes, that does not mean that

they create a localized interest so strong that it outweighs the substantial Hong Kong interest in this dispute.

Hong Kong has a much greater interest in policing the fraudulent activities of its own corporations, especially when they allegedly harm one of its own citizen's business ventures. Pyrenee's bucketing claim alleges a fraud that was perpetrated entirely in Hong Kong. Likewise, the price of Pyrenee's CME trades was allegedly misrepresented in Hong Kong, and the profits from these misrepresentations were realized in Hong Kong. In short, we agree with Wocom that "Pyrenee's allegations involve an alleged scheme by a Hong Kong broker to bucket trades and steal ticks in Hong Kong from a company directed by a Hong Kong citizen and resident." Def. Br. at 12. Under these facts, Hong Kong's concrete interest is much stronger than the United States' more abstract interest in a scheme which may or may not have truly affected United States markets.[12] Along the same lines, it would be grossly unfair to impose jury duty on American citizens in this case, considering that all of the relevant actors and most of the relevant conduct took place in Hong Kong, and that the American interest is at best indirect.

We conclude by pointing out that the Seventh Circuit has already provided us fodder for a forum non conveniens dismissal with its opinion in *Mak v. Wocom Commodities, Ltd.*, a suit comprised of parties and claims nearly identical to those in this case. After dismissing the case for lack of subject matter jurisdiction, the court stated:

> Further, Hong Kong would have been a more convenient forum for all parties. Mak relied on Hong Kong jurisdiction in a prior case and could have in this one. We cannot make our judicial system available to those who seek to involve our courts in their foreign problems as they shop here for what they perceive to be a more advantageous forum.

112 F.3d at 291. Although this language is dicta in light of the court's jurisdictional ruling, it serves to underscore our conclusion that this litigation simply does not have suffi-

cient United States connections to warrant the exercise of our jurisdiction.

## CONCLUSION

This Court finds that the proper exercise of its discretion under the doctrine of forum non conveniens requires dismissal. Hong Kong provides an adequate forum for this dispute, and the private and public interest factors point overwhelmingly in favor of litigating this case in Hong Kong. This case is hereby dismissed, without prejudice to Pyrenee's right to refile its claims in Hong Kong.

---

12. Notably, no United States entity has sought to intervene in this suit under the guise of protect-ing United States interests.